IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF MARYLAND

----------------------------

JESSICA LITZINGER,                    :
                                      :
            Plaintiff,    :
                                      :
    vs.                   : CASE NO. JFM-02-4115
                                      :
BRADLEY A. McGUIRK,       :
                                      :
            Defendant.    :
                                      :
----------------------------

                        Tuesday, February 10, 2004

Deposition of

                    BRADLEY A. McGUIRK,

the Defendant, called for examination by counsel for

the Plaintiff, pursuant to Notice, at 305 Washington

Avenue, Towson, Maryland 21204, commencing at 1:07

p.m., there being present on behalf of the respective

parties:

ON BEHALF OF THE PLAINTIFF:

    DUANE VERDERAIME, ESQUIRE
    1231 North Calvert Street
    Baltimore, Maryland 21203

                    HUNT REPORTING COMPANY
        Court Reporting and Litigation Support
      Serving Maryland, Washington, and Virginia
                    410-766-HUNT (4868)
                    1-800-950-DEPO (3376)

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    what you were doing?

2         A    No, sir.

3         Q    What do you remember?  What's the first thing

4    you remember?

5         A    In reference to?

6         Q    In reference to the incident; did you get a

7    call on the radio or you just arrived by the scene, or

8    what happens?  How did you find out about the accident?

9         A    I would have been given the call over the

10   barrack radio.

11        Q    Okay.

12        A    Upon my arrival at the scene, the first thing

13   I saw was a vehicle off the roadway, and people

14   standing outside of it.

15        Q    Okay.  Do you remember -- I mean you say you

16   don't remember where you were coming from, do you

17   remember any of the roads or streets you took to get to

18   the -- to get to the location?

19        A    I'm pretty sure that I came off of 222.

20        Q    Okay.  Two twenty two, and then -- is that --

21   does that intersect -- where would you take 222 to get

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    you park your police car?

2        A    I don't know.

3        Q    Just approximately, I'm not going to hold you

4    to any distances, 100 yards, 10 feet, inch?

5        A    Maybe 50 yards.

6        Q    Fifty yards?  Okay.  When you responded, do

7    you recall whether you had lights and siren on?

8        A    No, I don't recall.

9        Q    When a call goes out for -- what was the call

10    that you got?

11        A    For an accident.

12        Q    Auto accident?

13        A    Yes.

14        Q    Anything else?

15        A    I don't recall.

16        Q    Would the radio logs indicate, if you know,

17    what the -- if there anything else in the --

18        A    I'm not aware.

19        Q    So you get a call that just an accident has

20    taken place?

21        A    Right.

HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1      Q     Was there more than one?

2      A     Yes, sir.

3      Q     All right, you get out of your vehicle.  What

4    do you do at that point?

5      A     I try to start gathering information,

6    identifying the occupants of the vehicle, any witnesses

7    that might have seen the accident.

8      Q     When you say you try to investigate, and get

9    some information, you walked -- did these people come

10    over to your car, or did you go over to the vehicle

11    that was crashed?

12      A     They weren't in the vehicle, they were

13    outside the vehicle.

14      Q     Where?

15      A     On the embankment.

16      Q     On the embankment, so you walked over to the

17    embankment area?

18      A     Right.

19      Q     Okay.  And who did you talk with there?

20      A     I know I spoke with Ms. Litzinger and Mr.

21    Everett.  There was other people there, I don't know

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   closest to where the accident occurred, which wasn't

2   directly in front of the house, it was over these -- it

3   was down the road.

4        Q    And when did you talk to him?

5        A    At some point during the information, or the

6   investigation.

7        Q    Do you recall if he was there at the time

8   when you first pulled up, this gathering of people?

9        A    No, I don't recall.

10       Q    Do you remember where you talked to this man?

11  Was it at his house or was at the scene?

12       A    At his house.

13       Q    You talked to him at his house?

14       A    Yes, sir.

15       Q    That night?

16       A    Yes, sir.

17       Q    Okay.  In his house or in front of his house?

18       A    Both.

19       Q    Okay.  And what was the conversation?

20       A    I asked to use his phone.

21       Q    Okay.  And did he let you use his phone?

FORM CSR-LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1       A    Yes, sir.

2       Q    Okay.  And who did you call?

3       A    My supervisor.

4       Q    And what is your supervisor's name?

5       A    At the time, it was Sargent Blades.

6       Q    That's who you called?

7       A    Yes, sir.

8       Q    Blades?

9       A    Yes, sir.

10      Q    Why did you call Sargent Blades?

11      A    I had questions.

12      Q    What questions did you ask him?

13      A    I told him about the situation that I had and

14   what the accident entailed.

15      Q    What did you tell him it entailed?

16      A    Two people in the vehicle, both of them,

17   obviously under the influence of alcohol, neither one

18   were claiming that they were driving.

19      Q    Okay.  So why -- you said you had some

20   questions for Sargent Blades.  What were the questions?

21      A    Just what to do at that point.


                    HUNT REPORTING COMPANY
              Court Reporting and Litigation Support
             Serving Maryland, Washington, and Virginia
                      410-766-HUNT (4868)
                      1-800-950-DEPO (3376)

1      Q      Did you mention to Sargent Blades that there

2    were -- when you talked about there were two people in

3    the car and under the influence, did you describe the

4    accident at all, to him?

5      A      I don't recall.

6      Q      And so the purpose to call Sargent Blades was

7    what, to get advise on the what to do at the scene?

8      A      Yes, sir.

9      Q      Okay.  And what did he tell you?

10     A      He told me to go back out and look at the

11   car, speak to them again, see if there are any

12   witnesses, see if I could determine who was driving if

13   they didn't want to tell me.

14     Q      Okay.  So just do further investigation,

15   basically?

16     A      Right.

17     Q      Did he ask you if you needed any back-up or

18   any help?

19     A      No, sir.

20     Q      And you didn't ask for any?

21     A      No, sir.

HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)

1    that saw the accident, spoke to them again, tried to

2    find out who was driving this car.

3         Q    Right.  What else did you do to ascertain

4    that information?

5         A    Ran checks on drivers' licenses and

6    registration on the car.

7         Q    And when you say you tried to find out if

8    there were any witnesses, do you recall talking to

9    anybody, specifically?

10        A    Whoever was at the scene.

11        Q    Right.

12        A    Nobody specifically.

13        Q    What do you recall anybody saying?

14        A    I wasn't able to find a witness to the

15   accident.

16        Q    Okay.  Then when you weren't able to find a

17   witness, what was -- what led you to believe you

18   couldn't find a witness?  You had other people standing

19   there.

20        A    Right.  After speaking to them, nobody saw

21   the accident happen.


HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    possession?

2        A    I don't recall.

3        Q    How about Ms. Litzinger?

4        A    Do not recall.

5        Q    Okay.  And you said -- I'm just trying to get

6    your testimony accurate.  In reference to the

7    registration, you tell me that you don't remember

8    whether you actually had a registration or you ran it

9    through the license tag; is that right?

10       A    I did run the registration for the vehicle;

11   how it was obtained, I don't recall.

12       Q    Okay.  That's my question.  You don't recall

13   whether you got it from a registration slip, or you did

14   it off the license tag?

15       A    No, sir.

16       Q    Okay.  Okay.  You're trying to find

17   witnesses, not fruitful.  To run the registration, how

18   is that done then, registration and license?

19       A    Over the radio.

20       Q    You do it right over the radio?  Okay.  You

21   don't have to go back to the car?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    would on a telephone.

2         Q    Okay.  And these questions are the ones you

3    mentioned before?

4         A    Yes, sir.

5         Q    Were there any other questions that you had

6    for him?

7         A    No, sir.

8         Q    Okay.  Did you go back up to the man's house

9    a second time?

10        A    Yes, sir.

11        Q    And you used the phone again?

12        A    Yes, sir.

13        Q    And what was the purpose of that second phone

14   call?

15        A    At that point Ms. Litzinger had been placed

16   in handcuffs and placed in my patrol vehicle.  I went

17   back and told him what the situation was, and what I

18   had done, and what I was doing, and to seek more advice

19   from Sargent Blades.

20        Q    Okay.  And what -- what did you tell him that

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

51

1     you had done?

2          A     I told him that I had placed Ms. Litzinger in

3     handcuffs, due to the fact that she was the registered

4     owner of the vehicle.  Mr. Everett was claiming that

5     she was the driver, and that basically she was in

6     investigative detention while I spoke to my Sargent.

7          Q     Did you actually tell -- did you actually use

8     those words to Sargent Blades, "She was in

9     investigative detention" while you had a chance to call

10    him?

11         A     I don't recall.

12         Q     Okay.  All right, you placed her in

13    handcuffs, I'm sorry, what was the reason?

14         A     She was the registered owner of the vehicle,

15    Mr. Everett claimed she was the driver, and she was

16    intoxicated, obviously.

17         Q     Now why do you say obviously?  How do you

18    know she was intoxicated?

19         A     Her speech, her eyes, the odor of alcohol.

20         Q     What about her speech gave you an indication

1    she was intoxicated?

2        A    Just slow.

3        Q    You remember her speech being slow?

4        A    Yes, sir.

5        Q    And what do you remember about her eyes to

6    indicate that she was intoxicated?

7        A    Glassy, blood shot, strong odor of alcoholic

8    beverage.

9        Q    You also recall her being having a strong

10   odor of alcohol?  Did you ask her had she been

11   drinking?

12       A    Yes, sir.

13       Q    Okay.  And what was her response?

14       A    I don't recall.

15       Q    What did -- did you give Ms. Litzinger any

16   field sobriety tests?

17       A    No, sir.

18       Q    How about a Breathalyzer?

19       A    No, sir.

20       Q    How about Mr. Everett, did you give him a

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    on the licenses?

2        A    Yes, sir.

3        Q    Okay.  What did you do after you ran the

4    check on the licenses and the registration?

5        A    That's the point where Ms. Litzinger was

6    placed in handcuffs.

7        Q    Okay.  And when you placed her in handcuffs,

8    did you tell her, "You're under arrest"?

9        A    I don't recall.

10       Q    Okay.  And describe for me how you placed Ms.

11   Litzinger in handcuffs.

12       A    Handcuffs were placed behind her back, as

13   standard procedure per MSP policy.

14       Q    Okay.  I don't know what that is, that's why,

15   I guess, I'm asking, educate me.  How is that -- how is

16   that done?  How is it done?

17       A    Handcuff behind the back, double strands up,

18   keyholes out.

19       Q    I mean, do you recall asking her to put your

20   hands behind the back and she did, or you had to grab

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

59

1   her hands; what do you recall doing?

2         A    No, there was no struggle.

3         Q    No struggle?

4         A    No, sir.

5         Q    I guess describe for me what contact, if any,

6   you did have then with Ms. Litzinger while you're

7   placing the handcuffs on.

8         A    After she was placed in handcuffs, she was --

9         Q    I mean, during -- I mean putting the

10  handcuffs on, I mean.  Did she just put her hands

11  behind her back, you snapped them on?  What physical

12  contact did you have with her, if any, in --

13        A    I don't recall any physical struggle at all.

14        Q    Not necessarily a struggle, I guess my

15  question is just even the slightest touch, did you grab

16  her wrist and pull it behind her back --

17        A    That's, I mean, you grab their hand or their

18  wrist, or their arm --

19        Q    Okay.

20        A    -- and that's how the handcuffs are placed

HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)

1    on.

2         Q    Okay.  And you -- and do you recall her doing

3    that?

4         A    I don't recall.

5         Q    Okay.  But you do recall that the handcuffs

6    were put on without a struggle?

7         A    Yes, sir.

8         Q    Okay.  And now, after the handcuffs are on,

9    what -- what happens at that point?

10        A    She's escorted to the front seat of my patrol

11   car.

12        Q    Okay.  Was there any -- any struggle while

13   you're escorting her?

14        A    No, sir.

15        Q    Was there any difficult (sic) in walking to

16   the car?

17        A    No, sir.

18        Q    Okay.  Was she saying anything to you while

19   you're walking to the car?

20        A    I don't recall.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    Q    Do you recall saying anything to her?

2    A    No, sir.

3    Q    Okay.  Do you recall whether she vomited on

4    her way to the car?

5    A    No, sir.

6    Q    Okay.  And you placed her in the front seat

7    of the car?

8    A    Yes, sir.

9    Q    Is that correct?  All right.  Describe for

10   me, I guess if you can, what's -- how that took place,

11   was the -- did you open the door for her or what

12   happened?  Tell me what happened.

13   A    Yes, sir.  I would have to open the door for

14   her.

15   Q    Okay.

16   A    And she was seated in the front seat.

17   Q    Okay.  And then -- then what happened?

18   A    As far as what?

19   Q    What did you do next?  Shut the door?

20   A    Yes, sir.

HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

62

1       Q      Then what did you do?

2       A      I would have went around and probably got in

3    the driver's seat of my car.  I don't recall specifics

4    about what happened.

5       Q      What's the next thing you remember doing?

6       A      Calling Sargent Blades.

7       Q      Okay.  So you recall placing her in the car?

8       A      Yes, sir.

9       Q      Okay.  While she's sitting in the car at that

10   point, does Ms. Litzinger say anything to you?

11      A      I don't recall.

12      Q      Doesn't -- you don't recall if she's saying

13   that she's in pain or anything?

14      A      Not at that point she wasn't.

15      Q      Okay.  Up until this point, did you, I guess,

16   recognize or notice any injuries on anybody?

17      A      No, sir.

18      Q      Okay.  And had anybody, now, up to the point

19   that you placed her in the car, mentioned that they

20   were hurt?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

63

1        A    No, sir.

2        Q    Okay.  The first conversation with Sargent

3    Blades, about how long do you think that took?

4        A    I don't recall.

5        Q    Well, I guess there wouldn't be a radio log

6    of that.  What -- was it a half an hour conversation?

7        A    No, it was a short conversation as far as a

8    time, minutes wise, I don't recall.

9        Q    Well, I don't need exact time --

10       A    It was a short conversation.

11       Q    Five, ten minutes?

12       A    Most likely.

13       Q    In that range?

14       A    Yes, sir.

15       Q    Okay.  And then how long do you think it was

16    between leaving the gentleman's house for the first

17    call, until the time you end up placing Ms. Litzinger

18    in the vehicle?

19       A    I --

20       Q    Let's put it this way, how long do you think

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

64

1    you talked to the people down at the hill in your -- in

2    your inquiry?

3        A    Maybe another five minutes.

4        Q    Okay.  And I think you answered this, you

5    don't recall telling Ms. Litzinger she was under

6    arrest?

7        A    No, sir.

8        Q    Okay.  Do you recall telling her any reason

9    why you were putting handcuffs on her?

10       A    I don't recall.

11       Q    You don't recall one way or the other?

12       A    No, sir.

13       Q    I mean, do you don't recall saying anything,

14   or you don't recall what you said?

15       A    I don't recall if I said anything or what I

16   said.

17       Q    Okay.  Okay.  Now you head back up to Mr.

18   Gilbert's house, and make the second call to Sargent

19   Blades?

20       A    Yes, sir.

HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1      Q      Okay.  And how long was that conversation?

2      A      About the same length as the first one.

3      Q      Okay.  At this time, what's -- what's Mr.

4  Gilbert doing; do you know?

5      A      He was standing with me.

6      Q      Okay.

7      A      While I was on the phone.

8      Q      Okay.  Was anybody else there?

9      A      I don't recall.

10      Q      His wife?

11      A      I don't recall that.

12      Q      After you leave near the second call, what do

13  you do then?

14      A      Return to my patrol vehicle.

15      Q      Okay.  And what do you return there?

16      A      This is when she was gasping for air, saying

17  she couldn't breathe.

18      Q      Were you in the car at this time?

19      A      Yes.

20      Q      Okay.  And what was your response, if any?


HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

66

1      A    I asked if her if she wanted an ambulance.

2      Q    Okay.  What did she say?

3      A    Yes.

4      Q    Okay.  Did you ask her what was wrong?

5      A    Well, she was telling me that she couldn't

6 breathe.

7      Q    Anything else?

8      A    That was her complaint, she couldn't breathe.

9      Q    Okay.  Do you recall her saying anything

10 else, other than that?

11     A    No, sir.

12     Q    Okay.  And did you call for an ambulance?

13     A    Yes, sir.

14     Q    And how is that done?

15     A    Over the radio.

16     Q    And how does that -- how does that go out?

17 How does that call go out?

18     A    I call the barrack, the barrack calls the

19 ambulance, the fire and ambulance dispatch, and then

20 they dispatch the fire company.

HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)

1    Q    Okay.  And what did you -- what did you say

2    in that call?

3    A    I don't recall.

4    Q    Do you recall whether or not you mentioned

5    any particular injuries or not, or is it just like a

6    general call for an ambulance?

7    A    I don't recall.

8    Q    Okay.  What did you -- other than calling for

9    an ambulance, what else did you do then, in response to

10   her saying, "I'm gasping for air.  I can't breathe"?

11   A    Well, that's when the handcuffs were taken

12   off of her, ambulance arrives.

13   Q    Was she still in the car when you took the

14   handcuffs off?

15   A    Yes, sir.

16   Q    Okay.  What else did you -- what else did you

17   -- while you're still in the car now, what else did you

18   say to Ms. Litzinger, anything?

19   A    I don't recall.

20   Q    Do you remember asking her about any money?

HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1      A     I don't recall any questions asked to her in

2   the car.

3      Q     Okay.  And you take the handcuffs off, and

4   that's when the ambulance arrives?

5      A     Yes, sir.

6      Q     Did you take them off prior to the ambulance

7   getting there?

8      A     Yes, sir.

9      Q     How -- how long do you think it was from the

10  time you made the call for the ambulance to arrive?

11     A     I don't know, I'd be guessing.

12     Q     Okay.  Yeah, just a guess?

13           MR. HOFFMAN:  No.  Objection.  Don't guess.

14  I'll instruct the witness not to guess.

15           BY MR. VERDERAIME:

16     Q     Well, I guess -- I'm not going to hold you to

17  any particular time.  I'm just trying to get an idea in

18  my mind.  Was it 30 seconds, was it an hour?

19     A     I don't know.

20     Q     Half an hour?

69

1       A    I don't know.

2       Q    You have no idea what the time was?

3       A    No, sir.

4       Q    Okay.  What were you doing while you were

5  waiting for the ambulance to arrive?

6       A    Just that, waiting for the ambulance to

7  arrive.

8       Q    Just sitting in the car with Ms. Litzinger?

9       A    Yes, sir.

10      Q    And while you are waiting for the ambulance

11  to arrive, there's no other conversation with Ms.

12  Litzinger?

13      A    Not that I recall.

14      Q    And once the ambulance arrives, what happens

15  then?

16      A    They come up to the car, they bring the

17  stretcher up to the car, she stays seated in the car

18  while they talk to her.  Then she's taken out of the

19  seat of my vehicle and put on the stretcher.  They

20  immobilize her and put her in the ambulance.

HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-826-6313

1    point?

2        A    No, sir.

3        Q    Do you remember asking Ms. Litzinger who Mr.

4    Edmunds is?

5        A    I don't recall.

6            MS. LITZINGER:  Excuse me, his last name is

7    Edwards.

8            BY MR. VERDERAIME:

9        Q    Edwards.  While Ms. Litzinger was handcuffed

10   in your vehicle, was she -- was she free to leave?

11       A    I'm sorry.

12       Q    Was she free to leave?

13       A    No, sir.

14       Q    Okay.  While she was handcuffed in your

15   vehicle, did you -- I'm going to strike that.  I think

16   you answered that question already.

17           Just be patient.  I think we covered all my

18   questions already.

19       A    Yes, sir.

20       Q    While I'm looking, let me ask you this.  What

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1  that as well.  And then you put down there that both

2  were under the influence of alcohol.  Was there any

3  reason why you didn't place Brandon under arrest?

4      A    I didn't determine that he was the driver or

5  didn't suspect that he was the driver.

6      Q    Okay.  And what led you to believe that Ms.

7  Litzinger was the driver?

8      A    Because she was the registered owner of the

9  vehicle and Mr. Everett was claiming that she was the

10  driver of the vehicle.

11     Q    I think that's it.  Do you have any

12  questions?

13                   CROSS EXAMINATION

14         BY MR. HOFFMAN:

15     Q    Yes.  Trooper, at the scene of the collision,

16  prior to you placing Ms. Litzinger in a vehicle, did

17  you ever observe her standing unassisted, on her own

18  two feet?

19     A    Yes, sir.

20     Q    At the scene of the collision, prior to you

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    placing Ms. Litzinger in your police vehicle see her

2    walking unassisted, under her own power?

3        A    Yes, sir.

4        Q    Trooper, at the scene of the collision, prior

5    to placing Ms. Litzinger in a vehicle, did she complain

6    of any pain to you?

7        A    No, sir.

8        Q    At the scene of the collision, after you

9    placed Ms. Litzinger in the vehicle, did she complain

10   of any pain to you?

11       A    Yes, sir.

12       Q    And when was that, sir?

13       A    After she was placed in handcuffs and put in

14   the patrol vehicle.

15       Q    At the scene of the collision, in all of your

16   interaction with Ms. Litzinger, did you personally

17   observe any injuries to Ms. Litzinger?

18       A    No, sir.

19       Q    Prior to Ms. -- at the scene of the

20   collision, prior to Ms. Litzinger gasping for breath

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313